Affirmed and Memorandum Opinion filed May 25, 2006









Affirmed
and Memorandum Opinion filed May 25, 2006.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-05-00413-CR

NO.
14-05-00414-CR

____________

 

ROBERT JAMEY
NELSON,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 10th
District Court

Galveston County, Texas

Trial Court Cause No. 03CR1943
& 03CR1944

 



 

M E M O R A N D U M   O P I N I O N








Appellant, Robert Jamey Nelson, appeals
his convictions on two counts of aggravated sexual assault of a child. See Tex. Pen. Code Ann.' 22.021(a)(1)(B)(i) &
(ii) (Vernon 2003). These matters were consolidated for trial. After pleading
not guilty, appellant was found guilty by a jury on both counts. Appellant was
sentenced by the jury to five years= probation on his
conviction for violating Tex. Pen. Code
Ann. '22.021(a)(1)(B)(ii) in trial court cause number 03CR1943, and five years= confinement in
the Institutional Division of the Texas Department of Criminal Justice for
violating Tex. Pen. Code Ann. '22.021(a)(1)(B)(i) in
trial court cause number 03CR1944. Appellant asserts two issues on appeal: (1)
the trial court erred in refusing appellant access to the State=s records tracking
venire members= past criminal jury service; and (2) the
evidence was factually insufficient to support either guilty verdict. We affirm
the judgments in both cases.

Factual and
Procedural Background[1] 

At the time appellant was accused of
sexually assaulting K.J., the child was four years old. Appellant was living
with Cheneathea Johnson, K.J.=s mother, at the
time in question. The State charged appellant with intentionally causing his
sexual organ to penetrate K.J.=s anus and mouth.

Shirley Ann Davis was the first witness.
Davis testified that K.J. frequently stayed at her house. On November 18, 2002,
during one of these visits, Davis testified K.J. told her that appellant, who
was living with K.J.=s mother at the time, had made her suck
his penis and Adrink all the white hot soup.@ After informing
K.J.=s mother, the
incident was reported to police.








Carmen Crabtree, from the Advocacy Center
for children in Galveston, interviewed K.J. on November 22, 2002, and testified
at trial. Crabtree=s interview of K.J. was videotaped and the
videotape was played for the jury. During the interview Crabtree questioned
K.J. about her names for various body parts for both males and females.
Pointing to a picture, K.J. identified a male body part in the vicinity of the
penis as a Atail.@  During the course of the interview, K.J.
denied several times that anything had happened to her. However, K.J. did state
that (1) she had told Davis what had happened and Crabtree could ask Davis; and
(2) appellant=s tail had touched her somewhere. Crabtree
admitted it was rare for a child to deny an incident after making an
allegation. In Crabtree=s experience, there were several possible
explanations as to why a child would do this. First and foremost was the
possibility that nothing had happened to the child. Second, in response to the
reaction to the revelation by those closest to the child, the child decides he
or she does not wish to discuss it further. The final possible explanation is
that someone has pressured the child to say nothing had happened.

K.J., now six years of age, testified via
closed circuit television. K.J. confirmed that she knew the difference between
the truth and a lie. K.J. identified Davis as the person to whom she told what
appellant had done to her. K.J. also testified that she told Davis about the
incident Abecause it really happened to [her].@ K.J. also told
the jury that she did not like appellant living with them Abecause he always
messed with us.@ K.J. also testified that appellant played
games with her. K.J. also admitted that it was not the truth when she told
Crabtree nothing had happened to her.

On December 3, 2002,  K.J. was examined at the ABC Center, part of
the University of Texas Medical Branch at Galveston (AUTMB@). The ABC Center
is a specialized facility for examining children who might be victims of
physical or sexual abuse. The examination of K.J. was performed by Joy
Blackmon, a physician=s assistant. The medical records of
Blackmon=s examination were
admitted into evidence without objection as State=s Exhibit Two.
Within the medical records, Blackmon reported K.J. told her A[appellant] had
stuck his tail in my mouth.@ K.J. also told
Blackmon that she was afraid of appellant. Finally, K.J. told Blackmon: A[appellant] put
his tail in my butt. He don=t do it all the
time. I mean in my butt, where I poop. It hurt. His tail had white on it.@ Blackmon
performed an examination of K.J.=s genital and anal
areas and took high magnification photographs with a colposcope of those areas.
Copies of those photographs were part of State=s Exhibit
Two.  Blackmon=s diagnosis was
that the rectal examination was abnormal, and that K.J. was a victim of child
sexual abuse.








Dr. James Lukefahr, the director of the
ABC Center and professor of medicine at UTMB, reviewed K.J.=s medical records,
including the photographs, and testified at trial. Lukefahr confirmed Blackmon=s diagnosis and
concluded: A[p]hotos depict the anal dilatation to
about 2 x 2 centimeters in two of the three frames described in the exam
record. [The anal dilatation] is an abnormal finding considered concerning for
sexual abuse and is consistent with the history of recent anal penetration.@[2] Lukefahr stated
that the use of the term Aconcerning for sexual abuse@ leaves open the
possibility of other causes, but in the majority of cases, a finding of anal
dilatation is felt to be the result of sexual abuse. Under cross-examination,
Lukefahr admitted that, in his experience, anal dilatation is most frequently
noted when the sexual abuse has happened fairly recently and that over time,
weeks or months, the finding typically does go away. Also, Lukefahr testified
there can be indicators of sexual abuse in the mouth, which can be seen if the
victim is examined within a day or two of the assault, Lukefahr admitted there
were no such indicators found in K.J.=s mouth.

Detective Kristi Anguiano of the La Marque
Police Department, investigated the allegations against appellant. She took the
statements of Davis, the outcry witness, and K.J.=s mother. In
addition, she interviewed appellant when he voluntarily appeared to give a
statement.








Appellant testified in his own defense.
According to appellant he commenced living with K.J.=s mother sometime
in September 2002. Appellant testified that K.J. frequently visited and stayed
with Davis and did not want to return home from Davis= house. Appellant
denied sexually assaulting K.J., instead he asserted he was visiting his
children in Port Arthur at the time the assault was alleged to have occurred.
Appellant testified his brother, James Nelson, drove him to Port Arthur on
October 29, 2002, and that he did not return to La Marque until sometime in
December 2002. Initially appellant testified he voluntarily gave his statement
to the La Marque Police on August 25, 2003, but during cross-examination, he
changed the time to a date after he was diagnosed with cancer in January 2003.
Later, he changed his testimony again, this time to December 18, 2002. During
cross-examination, appellant testified he had no problems with K.J. and denied
that he played games with her as she was not his child. Appellant admitted
that, at times, he was briefly left alone with K.J. and her younger sister, but
never with just K.J.

The final witness during the
guilt/innocence phase of the trial was appellant=s brother James
Nelson. Nelson testified that prior to October 31, 2002, appellant asked him to
drive appellant to Port Arthur to see appellant=s children. Nelson
agreed to do so and picked appellant up at Cheneathea Johnson=s house and drove
appellant to appellant=s wife=s residence in
Port Arthur. Nelson explained that appellant=s initial plan was
to stay in Port Arthur for two weeks, but appellant called Nelson and informed
him that he was going to stay longer. Sometime in the first week or two of
December 2002, appellant called Nelson and asked him to pick him up and drive
him back, which Nelson did.

The jury found appellant guilty of both
counts of aggravated sexual assault. After hearing the evidence during the
punishment phase, the jury assessed punishment at five years= confinement in
the Institutional Division of the Texas Department of Criminal Justice for
violating Tex. Pen. Code Ann. '22.021(a)(1)(B)(i)[3]
and five years= confinement in the Institutional Division
of the Texas Department of Criminal Justice for violating Tex. Pen. Code Ann. '22.021(a)(1)(B)(ii),[4]
with a recommendation that the sentence be probated. The trial court accepted
the jury=s verdicts and
entered judgments on the jury=s findings.
Appellant filed and later withdrew a motion for new trial, and this appeal
followed.

 








Discussion

I. The District Attorney=s Juror Database

In his first issue, appellant contends the
trial court erred when it denied appellant=s motion to allow
appellant to inspect the juror voting history database allegedly created and
possessed by the State=s prosecutor and which appellant alleges
contains data regarding venire members= prior jury
service, including how they voted in previous criminal trials. Appellant
contends this database gave the State an unfair advantage as this information
was unavailable to appellant by law, and therefore appellant did not have the
same information as the State when selecting the jury. Appellant contends this
denied appellant his right to an impartial trial by a jury of his peers. We
disagree.

Prior to voir dire, appellant made an oral
motion for access to the database. Appellant argued to the trial court that the
juror information allegedly contained in the database was Aunavailable to
[appellant] by law during his voir dire.@ The State
responded that the database was attorney work product and did not have to be
disclosed to appellant. In addition, without specifying exactly where, the
State argued the information contained in the database was available through
other sources. The trial court, finding the database was attorney work product,
overruled appellant=s oral motion. As the database at issue is
not contained in the record and appellant did not develop a record of what, if
anything, was in the database, we have no basis upon which to determine whether
the database was subject to any privilege or was otherwise immune from
disclosure.








Assuming, arguendo, that the database
contained information about the prospective jurors= prior criminal
jury service, the State generally has no obligation to furnish defense counsel
with that information. See e.g., Etheridge v. State, 903 S.W.2d
1, 7 (Tex. Crim. App. 1994); Martin v. State, 577 S.W.2d 490, 491 (Tex.
Crim. App. 1979); Helton
v. State, No.
14-03-00078-CR, 2004 WL 794327, at *2B3 (Tex. App.CHouston [14th Dist.] 2004, no
pet.)(not designated for publication). Here, appellant asserts that, as a
result of the database, the State had an unfair advantage as the juror
information allegedly contained in the database was unavailable by law to
appellant.  Appellant cites to no authority
in support of this argument. First, appellant failed to present to this Court
any authority for his argument that any advantage allegedly gained by the State=s possession of
this database is grounds to require disclosure by the State. Second, a review
of the case law and the record does not show that appellant was denied by law
or any action of the trial court from gaining access to this information
directly from the potential jurors during voir dire. The case law suggests that
it is within the trial court=s discretion
whether to allow questions about a potential juror=s prior jury
service during voir dire.[5]
Therefore, it was appellant=s obligation to
ask questions calculated to bring out information from prospective jurors
during voir dire that appellant believed would uncover potential prejudice or
bias. See Armstrong v. State, 897 S.W.2d 361, 363B364 (Tex. Crim.
App. 1995) (en banc). The record shows appellant made his motion for access to
the database, and the trial court denied the motion prior to voir dire. The
record also shows appellant did not attempt to question the prospective jurors
about prior criminal jury service during voir dire, and thus, there was no
action by the trial court to prevent appellant from obtaining that information
from the prospective jurors themselves. Appellant chose not to do so. Without a
bill of exception, we cannot accurately evaluate this alleged error. Tex. R. App. P. 33.2. Appellant=s first issue is
overruled.

 

 

 








II. Factual Insufficiency of the Evidence

In his second issue on appeal, appellant
argues the trial court erred when it denied appellant=s motion for
directed verdict as there is factually insufficient evidence to support the
verdicts.[6]
We disagree.

A. Standard of Review

When evaluating a challenge to the factual
sufficiency of the evidence, we review all of the evidence in a neutral light
and inquire whether the jury was rationally justified in finding guilt beyond a
reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex.
Crim. App. 2004). The evidence may be factually insufficient in two ways: (1)
when considered by itself, the evidence may be too weak to support a finding of
guilt beyond a reasonable doubt; and (2) when balanced against the evidence
supporting the verdict, the contrary evidence may be so strong that the
beyond-a-reasonable-doubt standard could not have been met. Id. at 484B85. In conducting
the factual sufficiency review, we must employ appropriate deference so that we
do not substitute our judgment for that of the fact finder. Id. at 481B82. Our evaluation
should not intrude upon the fact finder=s role as the sole
judge of the weight and credibility given to any witness=s testimony. Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). In conducting a
factual sufficiency review, we must discuss the evidence  appellant claims is most important in allegedly
undermining the jury=s verdict. Sims v. State, 99 S.W.3d
600, 603 (Tex. Crim. App. 2003).

B. The Evidence is Factually Sufficient to Support
Appellant=s Convictions








Appellant attacks the factual sufficiency
of the evidence by arguing that K.J.=s trial testimony
and the videotape of the interview conducted at the Advocacy Center fall short
of the level of proof required for conviction because, in appellant=s view, in both
instances K.J. testified that nothing improper happened. Appellant concedes
there is evidence in the record supporting the verdicts, specifically the
testimony of Shirley Ann Davis, the outcry witness, and medical records from
the ABC Center. This evidence is insufficient in appellant=s view as it was
not evidence from K.J. herself that appellant had sexually assaulted her.

Initially, we review the record for
evidence supporting the guilty verdicts. Davis testified that on November 18,
2002, K.J. told her appellant had sexually assaulted her. In State=s Exhibit Two, the
ABC Center medical records, Blackmon, the ABC Center physician=s assistant who
examined K.J.,  reported that K.J. told
her that A[appellant] had stuck his tail in my
mouth.@[7] K.J. also told
Blackmon that she was afraid of appellant. Finally, K.J. told Blackmon: A[appellant] put
his tail in my butt. He don=t do it all the
time. I mean in my butt, where I poop. It hurt. His tail had white on it.@ This examination
occurred on December 3, 2002. Dr. Lukefahr=s testimony that
he reviewed the ABC Center medical records and confirmed that K.J. was the
victim of sexual assault also support the jury=s verdict. Dr.
Lukefahr also testified that while anal dilatation is noticed most frequently
when the sexual abuse is recent, it can last for weeks or months after the
sexual abuse. This evidence shows that the sexual assaults on K.J. could have
occurred prior to appellant=s departure for
Port Arthur in late October 2002. In both the Advocacy Center interview and
during her trial testimony, K.J. confirmed that she told Davis about the
assaults and that they Areally happened.@ Finally, during
the Advocacy Center interview, K.J. stated that appellant=s Atail@ had touched her
somewhere. This evidence, when viewed in a neutral light and standing by
itself, is factually sufficient to support appellant=s convictions.
See Zuniga, 144 S.W.3d at 484B85.








Next, we must balance the evidence
supporting the verdict with the contrary evidence to determine if the contrary
evidence is strong enough that the beyond-a-reasonable-doubt standard could not
have been met. Id. The contrary evidence includes the fact that K.J. did
not specifically state, during the Advocacy Center interview or during her
trial testimony, that appellant had sexually assaulted her. It also includes
K.J.=s outright denial,
during the Advocacy Center interview, that anything had happened to her.
Crabtree, who conducted the Advocacy Center interview, testified that such a
denial is unusual if something had actually happened. According to Crabtree, the
first reason why a child would deny an assault had happened after making an
accusation, is that it never actually happened. Appellant testified that he did
not sexually assault K.J. Appellant and appellant=s brother
testified that appellant was in Port Arthur from late October until the first
or second week of December 2002, implying appellant was not present at K.J.=s home at the time
the assaults were alleged to have occurred. In addition, appellant testified he
was never alone with K.J., again implying he did not have an opportunity to
commit the assaults. Dr. Lukefahr testified there can be indicators of sexual
abuse in the mouth and that no such indicators were found in K.J.=s mouth.








The jury is the sole judge of the facts,
the credibility of the witnesses, and the weight to be given the evidence. Wyatt
v. State, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); Beckham v. State,
29 S.W.3d 148, 151B52 (Tex. App.CHouston [14th
Dist.] 2000, pet. ref=d). The jury was free to consider any
inconsistencies in K.J.=s testimony and to evaluate her
credibility accordingly. See Johnson v. State, 23 S.W.3d 1, 8
(Tex. Crim. App. 2000) (en banc). The jury was free to accept or reject
appellant=s own testimony that he did not commit the
offenses against K.J. See Beckham, 29 S.W.3d at 151. In addition, the
jury may believe or disbelieve all or part of any witness=s testimony. Jones
v. State, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998) (en banc).
Reconciliation of any conflicts in the evidence falls within the exclusive
province of the jury. Heiselbetz v. State, 906 S.W.2d 500, 504
(Tex. Crim. App. 1995) (en banc). Thus, the jury was free to believe that a four
year old child would not make the types of statements reported by Davis, the
outcry witness, unless she had heard them before.  In addition, the jury was free to accept or
reject appellant=s theories that he was (1) out of town, or
(2) never alone with K.J., and thus could not have committed the assaults. See
Goodman v. State, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001) (en
banc).

Again, we have reviewed the entire record.
Based on this record, we cannot say that the evidence contrary to the verdicts
is so overwhelming that the beyond-a-reasonable-doubt standard could not have
been met. See Zuniga, 144 S.W.3d at 484B85. As the
evidence is factually sufficient to support appellant=s convictions, we
overrule appellant=s second issue.

Having overruled appellant=s issues, we
affirm the trial court=s judgments.

 

 

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed May 25, 2006.

Panel
consists of Justices Anderson, Edelman, and Frost.

Do
Not Publish C Tex.
R. App. P. 47.2(b).

 

 











[1]  We note here
that appellant=s Statement of Facts in his brief is incomplete. The
most glaring examples of appellant=s
omissions include: (1) failing to include in the Statement of Facts the
contents of the Advocacy Center=s  videotaped
interview of K.J.; and  (2) omitting Dr.
Lukefahr=s testimony regarding his conclusion that K.J. was the
victim of sexual assault, but emphasizing testimony that was not relevant to
the charges against appellant (K.J.=s hymen
was completely normal and had no evidence of sexual penetration). 





[2]  Lukefahr
testified there are four possible causes of anal dilatation: (1) strong urge to
defecate; (2) recent bowel movement; (3) severe chronic constipation; and (4)
sexual abuse in the form of anal penetration. The medical records reveal that
Blackmon specifically asked about each of the three non-sexual abuse causes of
anal dilatation and eliminated them during the examination of K.J.  





[3]  Trial Court
Cause Number 03CR1944.





[4]  Trial Court
Cause Number 03CR1943.





[5]  See Bolden v. State, 634 S.W.2d 710, 712 (Tex. Crim.
App.  1982) (finding no abuse of
discretion where trial court did not permit appellant=s counsel to question venire about
their previous verdicts even though same information was allegedly possessed by
prosecutor); Redd v. State, 578 S.W.2d 129, 130B131 (Tex. Crim. App. 1979) (where
prosecutor had records of prior jury service and verdicts rendered, trial court
did not abuse its discretion in denying defense counsel from asking potential
jurors about their previous verdicts because Asome limitation on voir dire is
necessary or many trials would never end@); Oliver v. State, 739 S.W.2d 656, 657B58 (Tex. App.CDallas 1987, pet. ref=d) (holding trial court has the
right to confine examination of venire within reasonable limits, and thus,
trial court did not err in prohibiting questions regarding previous verdicts).





[6]  As a factual
sufficiency review begins with the presumption that the evidence supporting the
jury=s verdict is legally sufficient, and since appellant
challenges only the factual sufficiency of the evidence, he effectively
concedes that the evidence is legally sufficient to sustain the convictions. See
Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996) (en banc).





[7]  During her
interview at the Advocacy Center, K.J. clearly indicated she used the word Atail@ as her word for Apenis.@